**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EXC, Inc., a Nevada corporation, d/b/a) Express Charters and D.I.A. Express, Inc.;) Conlon Garage, Inc., a Colorado) corporation; Go Ahead Vacations, Inc., a) Massachusetts corporation; Russell J.) Conlon, and; National Interstate Insurance) Company, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>)<br>Jamien Rae Jensen, individually, and as) parent and next friend of D. J. J., and as) Personal Representative of the Wrongful) Death Estate of Corey Johnson; Chavis) Johnson, individually, and as Personal) Representative of the Wrongful Death) Estate of Butch Corey Johnson; Margaret) Johnson and Frank Johnson, individually,)) and as parents and next friends of H. J. and) D. J.; Francesca Johnson, individually;) Justin Johnson, individually; Raymond) Jensen, Sr., individually; Louise R. Jensen,) individually; Nicole Jensen, individually;) Ryan Jensen, individually; Justin Jensen,) individually; Katrina Jensen, individually;) Raymond Jensen, Jr., individually, and;) Murphy Jensen, individually, )<br>)<br>Defendants. )<br>) | Case No. CV 10-08197-PCT-JAT<br><br>**ORDER** |

Pending before the Court are (1) Plaintiffs' Motion for Summary Judgment (Doc. 99) and (2) the Jensen Defendants' Motion for Summary Judgment (Doc. 101). The Court now rules on the Motions.

## I.     FACTUAL BACKGROUND

The issues in this case arise out of an automobile accident that occurred on September 21, 2004 between occupants of a tour bus and occupants of a sedan. (Joint Statement of Facts, Doc. 82 at ¶ 1).  The tour bus was chartered by Plaintiff Express Charters or EXC, Inc. ("EXC") pursuant to a December 22, 2003 Coach Service Agreement between EXC and Plaintiff Go Ahead Vacations, Inc. for the purpose of the operation of tours in North America. *Id.* at ¶ 11. EXC, Inc. provided a tour vehicle and a qualified driver and Go Ahead Vacations organized the tour and provided a tour director. (*Id.* at ¶ 12). Plaintiff National Interstate Insurance Company provided insurance to Plaintiff EXC, Inc.  (*Id.* at ¶ 15). Plaintiff Conlon Garage, Inc. owned the tour bus. (Defendants' Statement of Facts, Doc. 111-1 at ¶ 30).

On the date of the collision, the tour bus was traveling within the boundaries of the Navajo Nation as part of a twelve day tour beginning on September 17, 2004 and ending on September 28, 2004. (*Id.* at ¶ 14). On September 20, 2011 and September 21, 2011, the tour bus made stops on the Navajo Nation at the Monument Valley Visitors Center and the Hampton Inn in Kayenta, Arizona, which is located on tribal trust land within the Navajo Nation. (*Id.* at ¶¶ 22-29). Over the course of the tour, Plaintiffs traversed almost 200 miles of Navajo Nation territory and stayed overnight at a Navajo Nation hotel. (*Id.* at ¶¶ 31 & 34).

Plaintiff Russell J. Conlon was operating the tour bus when it collided head-on with a 1997 Pontiac sedan within the exterior boundaries of the Navajo Nation on U.S. Highway 160. (*Id.* at ¶ 2). The sedan was driven by Butch Corey Johnson. (*Id.* at ¶ 5). Jamien Rae Jensen and D. Jensen Johnson were passengers in the sedan. (*Id.* at ¶ 6).  Butch Corey Johnson died of his accident-related injuries and D. Jensen Johnson sustained non-life-threatening injuries. (*Id.* at ¶¶ 7-8, 19). Jamien Rae Jensen was approximately one month pregnant at the time of the collision and later miscarried as a result of the collision. (*Id.* at ¶¶ 17-18). The three occupants of the Sedan were all members of the Navajo Nation. (*Id.* at ¶ 9).

The collision occurred on part of U.S. Highway 160, which is open to the public and maintained by the State of Arizona under a federally granted right-of-way over Navajo Nation land. (Plaintiffs' Separate Statement of Facts, Doc. 100 at ¶ 1; Doc 100-1). The portion of U.S. Highway 160 that crosses the Navajo Nation is approximately 197.4 miles. (Doc. 82 at ¶ 21). Navajo Nation Emergency Services, the Navajo Police Department, the Navajo Department of Criminal Investigations, and the Navajo Nation Department of Fire & Rescue Services were present on the scene of the September 21, 2004 collision on U.S. Highway 160 and, with the assistance of the Arizona Department of Public Safety, secured the scene, investigated the collision, cleared the scene of the collision, issued reports and provided governmental services. (Doc. 82 at ¶ 4).

## II.   PROCEDURAL BACKGROUND

On August 12, 2006, the Jensen Defendants filed negligence claims against Plaintiffs in the Kayenta District Court. Plaintiffs then filed a Motion to Dismiss based on lack of jurisdiction, which the Kayenta District Court denied. Thereafter, Plaintiffs filed a Writ of Prohibition with the Navajo Supreme Court seeking to prevent the Kayenta District Court from proceeding based on lack of subject matter jurisdiction. The Navajo Supreme Court affirmed, holding that the Kayenta District Court had jurisdiction.

Plaintiffs then filed this case seeking (1) a declaratory judgment that the Kayenta District Court lacks jurisdiction to hear the Jensen Defendants' claims and (2) an injunction barring the Jensen Defendants from proceeding with their claims in Kayenta District Court. Defendants then moved to dismiss Plaintiffs' Complaint without prejudice based on Plaintiffs' alleged failure to exhaust tribal court remedies. This Court denied Defendants' Motion to Dismiss, finding that requiring Plaintiffs to further exhaust their jurisdictional requirement in Kayenta District Court would be futile. (Doc. 80). Plaintiffs and Defendants now move for summary judgment on the jurisdictional issue.

## III.   LEGAL STANDARD

The Court reviews the factual findings in a tribal court's decision regarding tribal

jurisdiction for clear error and reviews questions of federal law de novo. *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313 (9th Cir. 1990). Further, a "tribal court's determination of its own jurisdiction is entitled to 'some deference.'" *Water Wheel Camp Recreation Area, Inc. v. LaRance*, 642 F.3d 802, 808 (9th Cir. 2011).

## IV.   ANALYSIS

Plaintiffs argue that, as a matter of law, the Navajo Nation tribal court has no jurisdiction over Plaintiffs, who are all nonmembers of the tribe, regarding the automobile accident that occurred on a state highway running over Navajo land. Plaintiffs rely on the United States Supreme Court's decision in *Strate v. A-1 Contractors*, 520 U.S. 438 (1997) to support their argument that the Navajo Nation lacks jurisdiction over them as a matter of law.

In *Strate*, Petitioner Fredericks, who was not a member of a Tribe, but was the widow of a deceased member of the Tribe and had five adult children who were Tribal members, was injured in an automobile accident with Respondent Stockert when Petitioner's vehicle collided with a gravel truck driven by Stockert and owned by Respondent A-1 Contractors, Stockert's employer. *Id.* at 443. The accident occurred on a portion of a North Dakota state highway running through the Fort Berthold Indian Reservation. *Id.* The strip of highway crossing the reservation was open to the public and maintained by the State of North Dakota under a right-of-way granted by the United States to the State's Highway Department. *Id.* The right-of-way was on land held by the United States in trust for the Three Affiliated Tribes and their members. *Id.*

Applying *Montana v. U.S.*, 450 U.S. 544 (1981), the *Strate* Court held that tribal courts may not entertain claims against nonmembers arising out of accidents on state highways absent a statute or treaty authorizing the tribe to govern the conduct of nonmembers on the highway in question. (*Id.* at 1408). The Court noted that the opinion did not attempt to decide the proper forum when an accident occurs on a tribal road within a reservation.

- 4 -

Defendants argue that *Strate,* and the analysis from *Montana* applied therein, only apply to cases where the tribe attempts to exert jurisdiction over nonmembers on *alienated non-reservation* land. Defendants argue that, in this case, the *Montana* analysis does not apply because the portion of U.S. Highway 160 where the accident occurred is tribal land. The *Strate* Court considered a nearly identical argument regarding a right-of-way through reservation land granted to North Dakota and found that the "right -of-way North Dakota acquired for the State's highway renders the 6.59-mile stretch equivalent, for nonmember governance purposes to alienated, non-Indian land." *Id.* at 1413. In *Strate*, the grant of the right-of-way over Indian land where the accident occurred was made for the purpose of facilitating public access to Lake Sakakawea, a federal water resource project under the control of the Army Corps of Engineers. *Id.* at 1414. The *Strate* Court noted that nothing in the grant expressly reserved the Tribe's right to exercise dominion or control over the right-of-way, and found that "[s]o long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude." *Id.* at 1414.[1]

The grant involved in this case was made pursuant to an agreement between the State Highway Commission, the Arizona Highway Department, and the United States of America, acting on behalf of the Bureau of Indian Affairs. (Doc. 100-1). The Navajo Tribal Council authorized the Chairman of the Tribe to give consent to the Bureau of Indian Affairs for the right-of-way and to transfer the right-of-way to the State of Arizona. (*Id.*; Doc. 100 at ¶ 2). The purpose of the grant was to provide for the design and construction of U.S. Highway 160 by the United States and the subsequent designation and maintenance of the road, as a public highway, by the State of Arizona. (*Id.* at 100-1). As in *Strate*, nothing the in the agreement

---

[1] The *Strate* Court recognized that there was no question in that case of the authority of tribal police to patrol roads within the reservation, including rights-of-way made part of a state highway and to detain and turn over to state officers nonmembers stopped on the highway for conduct violating state law. *Id.* at 1414 n.11. Likewise, no such question is presented in this case.

- 5 -

in this case expressly reserved the Tribe's right to exercise dominion or control over the right-of-way.

Defendants attempt to distinguish *Strate* by arguing that (1) the purpose of the right-of-way in *Strate* was to facilitate access to a federal water resource project, while the congressional intent for the right-of-way that became U.S. Highway 160 was to serve tribal interests and (2) the Three Affiliates Tribe in *Strate* received compensation for approving the grant of the right-of-way, while the Navajo Nation in this case expressly waived compensation for approving the grant of the right-of-way.

Despite these differences, in the absence of any express reservation of the Tribe's right to exercise dominion and control over the right-of-way, when the "stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude." 520 U.S. at 440. This holding in *Strate* leaves room for no other conclusion than that the stretch of U.S. Highway 160 within the Navajo reservation is equivalent, for nonmember governance purposes to alienated, non-Indian land, and thus, the Court must apply the *Montana* analysis to the jurisdictional issues in this case. Under *Montana*, absent express authorization by federal statute or treaty, "Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions:" (1) when nonmembers enter consensual relationships with the tribe or its members and (2) when the activity in question directly affects the tribes political integrity, economic security, health or welfare. 520 U.S. at 446 (citing *Montana v. United States*, 450 U.S. 544, 564-567 (1981)).

Accordingly, the first question the Court must address is whether there is express authorization in a federal statute or treaty giving the Tribe authority over the conduct of nonmembers on non-Indian land within a reservation.

### A.    An Express Treaty or Statute

In *Strate*, neither party referred the Court to a "treaty or statute authorizing the Three Affiliated Tribes to entertain highway-accident tort suits of the kind Fredericks commenced

1 against A-1 Contractors and Stockert," and thus, the Court found that, in order for the Tribal
2 Court to retain jurisdiction, the case needed to fall into one of the *Montana* exceptions. *Id.*
3 at 1414.

4 The Jensen Defendants argue that the Navajo Nation continues to enjoy treaty-based
5 ownership rights to all the land traversed by Plaintiff in the course of their on-reservation
6 commercial touring activities, including U.S. Highway 160. However, in this case, as in
7 *Strate*, Defendants fail to point to a treaty or statute authorizing the Navajo Nation to
8 entertain highway-accident tort suits of the kind that the Jensen Defendants commenced
9 against Plaintiffs. Accordingly, as in *Strate*, in order to prevail, Defendants must show that
10 Defendants' tribal-court action against nonmembers qualifies under one of *Montana's* two
11 exceptions.

### B. *Montana*'s First Exception

13 The first *Montana* exception covers "activities of nonmembers who enter consensual
14 relationships with the tribe or its members, through commercial dealing, contracts leases, or
15 other arrangements." *Strate*, 520 U.S. at 456.

16 In *Strate*, A-1 Contractors was engaged in subcontract work on the Fort Berthold
17 Reservation, and therefore had a "consensual relationship with the Tribes." *Id.* at 457.
18 However, Fredericks was not a party to the subcontract and the "Tribes were strangers to the
19 accident." *Id.* at 457. The *Strate* Court found that the tortious conduct alleged in Fredericks'
20 complaint did not fit within this exception, reasoning that the dispute was "distinctly non-
21 tribal in nature," arising "between two non-Indians involved in [a] run-of-the-mill highway
22 accident" and thus, unlike the types of cases where *Montana*'s first exception had been
23 applied, the Fredericks-Stockert highway accident did not present a "consensual relationship
24 of the qualifying kind." *Id.* at 457 (internal quotations omitted).

25 Plaintiffs argue that, as in *Strate*, this "run-of-the mill highway accident" does not
26 present a consensual relationship of the qualifying kind. In response, Defendants argue that
27 this case is distinguishable from *Strate* because Plaintiffs were engaged in a planned tour of

- 7 -

1 the Reservation prior to the accident and Plaintiffs were required to have a permit for such
2 a tour. Defendants argue that, had Plaintiffs acquired a permit, as they were legally required
3 to do, they would have been required to consent to the jurisdiction of the Navajo courts.
4 Defendants further argue that this case is distinguishable from *Strate* because the accident
5 in this case occurred between members of the tribe and nonmembers, whereas Fredericks
6 may have lived on the reservation, but was not a member of the tribe. In response, Plaintiffs
7 argue that whether or not they were required to get a permit to tour the Navajo reservation
8 is irrelevant to the issue at hand, or if it is relevant, "Plaintiffs' failure to apply for or receive
9 Navajo tourism permits shows their lack of consent to Navajo jurisdiction over their
10 activities." (Doc. 119 at 3).

### 1.     The Relevancy of Tourism Permits

It is undisputed that, on September 20 and September 21, 2011, Plaintiff did not (1) apply for a tour permit, (2) pay an annual permit fee of $3,000, (3) provide proof of liability insurance, (4) execute a Tourist Passenger Service Agreement; or (5) follow any other requirement of the Navajo Nation Tour and Guide Services Act (the "NNTGSA"), 5 N.N.C. § 2501, *et. seq.* or its associated regulations. (Doc. 82 at ¶ 33).

Defendants argue that, if Plaintiffs had acquired a permit, as they were required to under Navajo law, Plaintiffs would have been required to consent to the jurisdiction of the Navajo Courts. Defendants further argue that Plaintiffs should not benefit from their failure to comply with Navajo law.

The Navajo Nation Tour Guide and Services Act provides that "No person, firm, association or corporation shall, either directly or indirectly, furnish, provide or conduct passenger transportation for hire, for the purposes of touring, visiting, sightseeing or like activities within the Navajo Nation, unless such person, firm, association or corporation shall first obtain a permit from the Division of Economic Development of the Navajo Nation to perform such activities within the Navajo Nation." NNTGSA, 5 N.N.C. § 2501A at Doc. 104, Exhibit 1. When obtaining a permit, each Tour Company is required to execute a

- 8 -

1  contractual agreement, which includes the following language: "Permittee consents to the
2  jurisdiction of the Navajo Nation Courts relating to the activities under this Agreement on
3  lands within the jurisdiction of the Navajo Nation."   Doc. 105, Exhibit 3-1.

4        There is no question that the Navajo Nation has the right to regulate tourism on the
5  reservation.  "Indian tribes possess inherent sovereign powers, including the authority to
6  exclude." *Water Wheel Camp Recreational Aria, Inc. v. LaRance*, 642 F.3d 802, 808 (9th Cir.
7  2011) (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983)).  This includes
8  the "power to exclude nonmembers entirely or to condition their presence on the reservation."
9  *New Mexico*, 462 U.S. at 333 (internal citations omitted); *Water Wheel*, 642 F.3d at 810 ("a
10 tribe's power to exclude exists independently of its general jurisdictional authority.") (internal
11 citation omitted).  "This power to exclude non-Indians from tribal land necessarily includes
12 the lesser authority to set conditions on their entry through regulations."  *Id.* at 811.
13 "*Montana* limited the tribe's ability to exercise its power to exclude only as applied to the
14 regulation of non-Indians on non-Indian land, not on tribal land." *Id.* at 810.

15       With these principles in mind, there is no question that the Navajo Nation can place
16 conditions on nonmembers touring the Navajo Nation.  These conditions necessarily include
17 requiring any tourism company to obtain a license, enter into a Passenger Service Agreement,
18 and to abide by the Nation's laws regulating tourism.  If nonmembers do not agree to the
19 conditions set by the Nation, the Nation may exclude those members.

20       The Navajo Nation Supreme Court found that Plaintiffs' touring activities within the
21 Navajo Nation Reservation constituted tour business activities within the meaning of the
22 NNTGSA.  The Court finds no clear error in the tribal court's finding that petitioners were
23 engaged in tour business activities within the meaning of the NNTGSA.  *See FMC v.*
24 *Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313 (9th Cir. 1990)  (factual findings in a tribal
25 court's decision regarding tribal jurisdiction is reviewed for clear error); *Sanders v. Robinson*,
26 864 F.2d 630, 632 (9th Cir. 1988) (The tribal court's "interpretation of tribal law is binding"
27 on reviewing courts).

28

Plaintiffs argue that their evasion of the Nation's laws regulating tourism "shows their lack of consent to Navajo jurisdiction over their activities." The Court disagrees. Plaintiffs cannot claim that, by ignoring the Nation's laws, they have not consented to the Nation's jurisdiction. The Court agrees with the Navajo Nation Supreme Court's holding that "no person or entity may deny the Navajo Nation's regulatory and adjudicatory jurisdiction on the basis of a violation of [the Nation's] laws." *See* Doc. 83-1 at 13.

Accordingly, because Plaintiffs were required to comply with the NNTGSA, the Court will examine whether, if Plaintiffs had complied with the Nation's laws, they would have been required to "consent" to the tribal court's jurisdiction such that this case falls within *Montana*'s first exception.

          **a.    Whether Compliance with the Nation's Tourism Laws would be Consent within *Montana*'s First Exception.**

In *Strate*, there was no question A-1 Contractors had a consensual relationship with the Tribes based on the subcontract work it was engaged in on the Fort Berthold Reservation and therefore had a "consensual relationship with the Tribes." *Id.* at 457. Nonetheless, the *Strate* Court found that the relevant issue was whether consent could be implied on behalf of the nonmember based on the nature of that consensual relationship. In this case, "Navajo Nation Law provides for the regulation of tour operations within the jurisdictional limits of the Navajo Nation" and, if Plaintiffs had followed the laws regulating tourism activities, they would have been required to sign a contract with the Navajo Nation that stated "Permittee consents to the jurisdiction of the Navajo Nation Courts relating to the activities under this Agreement on lands within the jurisdiction of the Navajo Nation." *See* Doc. 104, Exhibit 2; Doc. 105, Exhibit 3.

Accordingly, the Court must determine whether a consensual relationship of the qualifying kind would have arisen between Plaintiffs and the Navajo Nation if they had entered into this contract, as was required by Navajo Nation law.

If the accident had occurred within the jurisdiction of the Navajo Nation, Plaintiffs

- 10 -

would have consented to tribal court jurisdiction. However, as discussed above, "[s]o long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowners's right to occupy and exclude." *Strate*, 520 U.S. at 456. Accordingly, the language in the Agreement relating to "lands within the jurisdiction of the Navajo Nation," cannot encompass the stretch of land maintained as part of the State's highway because the Nation's right to occupy and exclude does not extend to that stretch of land. Accordingly, even if Plaintiffs had followed the Nation's laws and entered into the Agreement regulating touring services, the contents of that Agreement do not give rise to an implication of consent by Plaintiffs to the tribal court exercising jurisdiction over them for the automobile accident that occurred on the State's Highway. Therefore, the highway accident at issue in this case does not fall within a consensual relationship as required by *Montana*'s first exception.

### C.     *Montana*'s Second Exception

*Montana*'s second exception applies if the conduct at issue "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. In analyzing *Montana*'s second exception, the *Strate* Court reasoned that:

> Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if *Montana*'s second exception requires no more, the exception would severely shrink the rule.

*Strate*, 520 U.S. at 457-58. Plaintiffs argue that this case is distinguishable from *Strate* because "commercial touring on the Navajo Reservation unconstrained by tribal regulatory authority 'menaces' the political integrity and the health and welfare of the tribe, and comprises a serous 'intrusion on tribal relations [and] self-government." (Doc. 101 at 17 (internal citation omitted)). While the Court has recognized that the Navajo Nation's power to exclude certainly gives the Nation the ability to regulate touring activity within the Reservation and protect tribal self-governance through those means, the Court is unable to

- 11 -

1  ascertain a difference between an individual (or a subcontractor) driving carelessly on a public
2  highway running through a reservation and a touring company driving carelessly on a public
3  highway running through a reservation. There is no question that, no matter who is driving,
4  such activity "endanger[s] all in the vicinity, and surely jeopardize[s] the safety of tribal
5  members." 520 U.S. at 458. However, the Court is bound by the *Strate* Court's finding that
6  "if Montana's second exception requires no more, the exception would severely shrink the
7  rule." 520 U.S. at 458. Accordingly, this case does not fall within *Montana*'s second
8  exception.

### V. CONCLUSION

Based on the foregoing, the Court finds that the Navajo Nation tribal court does not have jurisdiction over nonmember Plaintiffs relating to the highway accident that occurred on September 21, 2004.

**IT IS ORDERED** that the Joint Stipulations regarding Documents for Purposes of Motions for Summary Judgment (Doc. 81) are granted.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 99) is granted.

The Clerk of the Court shall enter a declaratory judgment that the Kayenta District Court lacks jurisdiction to hear the Jensen Defendants' claims relating to the September 21, 2004 state highway accident.

**IT IS FURTHER ORDERED** that the Jensen Defendants are permanently enjoined from proceeding with the claims relating to the September 21, 2004 state highway accident in Kayenta District Court.

////
///
//
/

- 12 -

**IT IS FINALLY ORDERED** that the Jensen Defendants' Motion for Summary Judgment (Doc. 101) is denied.

The Clerk of the Court shall close this case.

DATED this 9th day of August, 2012.

*[signature]*
James A. Teilborg
United States District Judge